IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
                                )
v.                              )  Case No.: 20-00201-01-CR-W-BCW
                                )
MARCELL MATTHEW SANDERS,        )
                                )
            Defendant.           )

## REPORT AND RECOMMENDATION TO
## DENY DEFENDANT'S MOTION TO SUPPRESS

Before the Court is Defendant's Motion to Suppress Evidence Obtained From Search and

Seizure. Defendant moves the Court to suppress all evidence recovered from the May 26, 2020,

search of his backpack and duffel bag. For the following reasons, Defendant's motion should be

denied.

## I. INTRODUCTION

An Indictment was returned on August 26, 2020, charging Defendant with one count of

possession with the intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1)(C). Defendant filed the instant motion to suppress on grounds that the investigative seizure

was not supported by reasonable suspicion and, therefore, violated the Fourth Amendment. (Docs.

22, 23) The Government filed suggestions in opposition (Doc. 30) and Defendant replied (Doc.

31). An evidentiary hearing was held, with all parties and counsel appearing in person. The

Government appeared by Assistant United States Attorney Sean Foley. Defendant was present,

represented by retained counsel Frederick Goetz and J.R. Hobbs. The Government called Kansas

1

City, Missouri Police Department Detective Paul B. Williams (Retired)[1] and Jackson County,

Missouri Sheriff's Office Detective Collin Love to testify.  Defendant testified on his own behalf.

The following exhibits were admitted into evidence:

| | |
|---|---|
| Government's Exhibit 1: | Greyhound Surveillance Video – Ch. 14 (Timestamps 7:12:20 a.m. – 7:17:32 a.m.) |
| Government's Exhibit 2: | Greyhound Surveillance Video – Ch. 15 (Timestamps 7:17:10 a.m. – 7:20:10 a.m.) |
| Government's Exhibit 3: | Greyhound Surveillance Video – Ch. 02 (Timestamps 7:17:55 a.m. – 7:23:45 a.m.) |
| Government's Exhibit 4: | Photograph of Bus Ticket and Receipt (SAND_00029) |
| Government's Exhibit 5: | Photograph of Cocaine (SAND_00031) |
| Government's Exhibit 6: | Photograph of TruNarc at 7:29 (SAND_00032) |
| Government's Exhibit 7: | Photograph of TruNarc at 7:33 (SAND_00033) |
| Government's Exhibit 8: | Photograph of Evidence Bag (SAND_00034) |
| Government's Exhibit 9: | Photograph of Driver's License (SAND_00035) |
| Government's Exhibit 10: | Photograph of Backpack (SAND_00036) |
| Government's Exhibit 11: | Photograph of Duffel Bag (SAND_00037) |
| Government's Exhibit 12: | Photograph of Baggage Tag on Duffel Bag (SAND_00038) |
| Government's Exhibit 13: | Photograph of Driver's License and Bus Ticket (SAND_00039) |
| Government's Exhibit 14: | Photograph of Open Backpack (SAND_00040) |
| Government's Exhibit 15: | Photograph (SAND_00041) |
| Government's Exhibit 16: | Photograph of Duffel Bag on Chair (SAND_00042) |
| Government's Exhibit 17: | Photograph of Contents of Bags (SAND_00043) |
| Government's Exhibit 18: | 21 U.S.C. § 844 |
| Government's Exhibit 19: | Missouri Revised Statute § 579.015 |
| | |
| Defendant's Exhibit 1: | Greyhound Surveillance Video – Ch. 8 |
| Defendant's Exhibit 2: | Greyhound Surveillance Video Still – Dock #2 (Timestamp 07:09:38 a.m.) |
| Defendant's Exhibit 3: | Greyhound Surveillance Video Still – Dock #2 (Timestamp 07:17:01 a.m.) |
| Defendant's Exhibit 4: | Greyhound Surveillance Video Still – Lobby 4 |
| Defendant's Exhibit 5: | Greyhound Surveillance Video Still – Lobby 4 (Timestamp 07:20:16 a.m.) |

---

[1] Paul Williams retired from the Kansas City, Missouri Police Department on December 26, 2020.  (Tr. at 7-8) Because he was on active duty on the date at issue, May 26, 2020, he will be referred to as "Detective Williams" in this Report and Recommendation.

## II. **FINDINGS OF FACT**

On the basis of the evidence presented at the suppression hearing, the undersigned submits

the following proposed findings of fact:

1.    Kansas City, Missouri Police Detective Paul Williams was in law enforcement for nearly 25 ½ years, two of which he was assigned to the Missouri Western Interdiction and Narcotics Drug Task Force ("MOWIN"). (Tr. at 8, 10) MOWIN performs interdiction activities at bus and train stations and facilities for shipping parcels. (Tr. at 9, 82)

2.    Detective Williams testified individuals trafficking narcotics use the Greyhound bus system to transport drugs. (Tr. at 12) When on interdiction duty at Greyhound, Detective Williams engaged between two and twelve people a day depending on the number of individuals traveling by bus. (Tr. at 19, 51) He estimated that in forty percent of such encounters, the individual did not possess contraband. (Tr. at 51)

3.    May 26, 2020, was the Tuesday after Memorial Day. (Tr. at 44) Due to COVID-19, masking and social distancing requirements were in place. (Tr. at 44-45) The CDC recommended that individuals maintain six feet of distance from others. (Tr. at 52-53) On May 26, 2020, Minneapolis, Minnesota was in the midst of a riot following the death of George Floyd the day before. (Tr. at 59)

4.    Detective Williams was working at the Greyhound Bus Terminal located at 1101 Troost in Kansas City, Missouri, on May 26, 2020. (Tr. at 11) Detective Williams is 6 feet tall and approximately 250 pounds. (Tr. at 46) He was not in uniform. (Tr. at 28)

5.    At approximately 7:15 a.m., Detective Williams and his MOWIN team members were waiting for a bus to arrive that had originated in Dallas, Texas. (Tr. at 11-12, 46) In addition to Detective Williams, the team was comprised of: Detective Love, who was about 6' 3" with a stocky build; Detective Winders, who was about 5' 11"; Detective Lanaman, who was about 5' 9"; and Special Agent Marriott. (Tr. at 45-48) All of the team members where white/Caucasian. (Tr. at 48) None were in uniform. (Tr. at 89-90)

6.    Texas is a known source state for narcotics, as it shares a border with Mexico. (Tr. at 13, 83) Because I-35 runs north from Dallas, Kansas City can be a conduit for drug-trafficking activity. (Tr. at 13-14) Detective Williams has made numerous arrests of suspected narcotic traffickers traveling by bus from Dallas. (Tr. at 14)

7.    At approximately 7:12:28, the bus originating in Dallas arrived. (Tr. at 15; Gvt. Exh. 1)

3

8.    Government's Exhibit 1 contains video captured by a surveillance camera at the terminal.  Detective Williams is seen in the video wearing a blue shirt; Detective Winders is the individual with him wearing a white shirt.  (Tr. at 15-16; Gvt. Exh. 1)  Detective Love appears at 7:12:57 wearing a black shirt and stands to the left of Detective Williams.  (Tr. at 15-16; Gvt. Exh. 1)

9.    Detective Williams observed passengers' behavior as they exited the bus.  (Tr. at 17)  He testified that individuals who are engaged in illegal activity often keep their head straight and look from side-to-side with their eyes, stand away from the luggage area, actively observe what is happening around them, and are nervous at the presence of a narcotics K-9 and law enforcement.  (Tr. at 17-18, 21, 31)

10.   At approximately 7:13:28, Detective Lanaman and his K-9 appear in the video at the rear of the bus while checking the luggage in the cargo compartment.  (Tr. at 20; Gvt. Exh. 1)  The K-9 did not show interest in any item of luggage in the cargo area or otherwise alert.  (Tr. at 50)   Likewise, the K-9 did not react to Defendant.  (Tr. at 50)

11.   Defendant exited the bus at approximately 7:14:24.  (Tr. at 20; Gvt. Exh. 1)  He was wearing dark pants with a white stripe down the sides and a grey hoodie.  (Gvt. Exh. 1)  Defendant is an African American male, who is 6' tall and weighs 180 pounds.  (Tr. at 48)

12.   Detective Williams testified Defendant observed the activities of the K-9, which caught Detective Williams' attention.  (Tr. at 21)

13.   Defendant stood back from the bus and watched the K-9 go through the bus.  (Tr. at 49; Gvt. Exh. 1)  There were also other individuals doing the same.  (Tr. at 49; Gvt. Exh. 1)  Defendant kept approximately six feet of distance between the people in front of him.  (Tr. at 53; Gvt. Exh. 1 at 7:14:40)

14.   Detective Williams testified Defendant's proximity away from the luggage area and the fact that he had traveled from a source city also drew his attention.  (Tr. at 21)

15.   After retrieving his luggage, Defendant entered the bus station at approximately 7:17:00.  (Tr. at 22; Gvt. Exh. 1; Def. Exh. 3)  While doing so, he walked directly in front of Detectives Williams, Love, Lanaman and the K-9.  (Tr. at 53; Gvt. Exh. 1 at 7:17:01)  Detective Williams testified there was nothing suspicious about the manner in which Defendant carried himself then. (Tr. at 53)

16.   Detective Williams and Detective Love entered the bus station at approximately 7:17:32.  (Tr. at 23; Gvt. Exh. 1)

4

17. At approximately 7:18:00,[2] Defendant exited the bus station using a door that led to the outdoor designated smoking area. (Tr. at 25; Gvt. Exh. 3; Def. Exh. 1)

18. The smoking area is at the end of a wide walkway abutting the docking areas. It is positioned against a brick wall of the bus station with the doors to the station on one side and the docking areas on the other. (Gvt. Exh. 3) On May 26, 2020, the docking area immediately adjacent to the smoking area was sectioned off by orange cones and yellow tape. (Gvt. Exh. 3) The smoking area is a public place. (Tr. at 27-28)

19. Detective Williams and Detective Love followed Defendant outside. (Tr. at 25; Gvt. Exh. 3 at 7:18:20; Def. Exh. 1 at 7:18:17; Def. Exh. 4) Detective Winders exited the station shortly thereafter. (Tr. at 55; Def. Exh. 5) An adult and child also exited the station into the smoking area, where they remained for just over three minutes. (Gvt. Exh. 3 at 7:18:20-7:21:45)

20. Detective Williams made contact with Defendant in the smoking area at approximately 7:18:20 and stood within arms' length. (Tr. at 28, 56, 95; Gvt. Exh. 3 at 7:18:20; Def. Exh. 1 at 7:18:17) As Detective Williams approached, Defendant was facing forward with his back toward the wall. (Tr. at 56; Gvt. Exh. 3 at 7:18:20; Def. Exh. 1 at 7:18:17)

21. Detective Love remained approximately six feet away and provided cover for Detective Williams during this exchange and did not speak with Defendant. (Tr. at 28, 33-34, 56, 95; Gvt. Exh. 2 at 7:17:28) Detective Love positioned himself near the wall closer to the docking area to allow an avenue for exit. (Tr. at 85-86; Gvt. Exh. 3) There was nobody blocking Defendant to his left. (Tr. at 86, 100; Gvt. Exh. 3; Def. Exh. 1)

22. Defendant testified he immediately knew they were law enforcement. (Tr. at 94) Defendant only noticed one other officer in addition to Detectives Williams and Love at that time. (Tr. at 95)

23. Detective Winders exited the bus station at approximately 7:18:24. (Tr. at 65-66; Def. Exh. 1) He stood against a bench alongside the docking area, four benches down from where Detective Williams, Detective Love and Defendant were standing. (Def. Exh. 1 at 7:18:24) Each bench is long enough to comfortably seat more than one adult; there is a similarly-proportioned space between each bench through which multiple individuals could walk. (Gvt. Exh. 3; Def. Exh. 1)

---

[2]The times on the respective security cameras are not synched. Government's Exhibit 3 and Defendant's Exhibit 1 appear to be nearly the same time. The timestamps appearing on Government's Exhibits 1 and 2 are approximately two minutes later than on Government's Exhibit 3 and Defendant's Exhibit 1. Because Government's Exhibit 3 best shows the events that transpired between Detective Williams and Defendant in the smoking area and Defendant's Exhibit 1 captures each of the MOWIN team members exiting the bus station, the timestamps from Government's Exhibit 3 and Defendant's Exhibit 1 will be used in setting forth the timeline of events.

24.    Detective Williams, in plain clothes, produced his badge, identified himself as a detective with the Kansas City, Missouri Police Department, and asked to speak with Defendant. (Tr. at 29, 57, 95) Defendant replied, "Sure." (Tr. at 29) Detective Williams did not advise Defendant that he did not have to speak with him or that he could walk away. (Tr. at 57, 96)

25.    Detective Williams asked where Defendant was coming from, where he was heading, and where he lived. (Tr. at 30) Defendant answered that he lived in Minneapolis and was heading home after visiting family in Dallas. (Tr. at 30)

26.    Detective Love testified Detective Williams' demeanor was calm. (Tr. at 86)

27.    Defendant testified Detective Williams spoke to him in an assertive manner and that Detective Williams was "running the conversation at the time." (Tr. at 96, 100)

28.    At approximately 7:19:38, Detective Lanaman exited the bus station and stood with Detective Winders who was still four benches away from Detective Williams, Detective Love and Defendant. (Tr. at 67; Def. Exh. 1) Detective Lanaman sat on the back of the bench at approximately 7:20:08 and appears to view a hand-held device. (Def. Exh. 1) The detectives remain alongside the bench conversing with each other on the side of the walkway near the docking areas and opposite the doors to the bus station, leaving the walkway unobstructed. (Def. Exh. 1)

29.    Detective Williams asked to see Defendant's bus ticket. (Tr. at 30) At approximately 7:19:05, Defendant complied and, when he handed the ticket to Detective Williams, Defendant's hand was shaking. (Tr. at 30; Gvt. Exh. 3) Detective Williams interpreted this as a sign of nervousness, which he believed was suspicious of criminal activity. (Tr. at 31) Detective Williams also noticed Defendant swallowed hard which resulted in seeing Defendant's Adam's apple, another indicator of nervousness. (Tr. at 60)

30.    Detective Williams reviewed Defendant's ticket and observed it was paid for in cash. (Tr. at 32; Gvt. Exh. 4) He returned the ticket at approximately 7:19:32. (Gvt. Exh. 3) Detective Williams testified cash payments can be indicative of criminal activity. (Tr. at 32)

31.    Detective Williams next asked to see Defendant's driver's license. (Tr. at 32) Defendant produced it at approximately 7:19:53. (Gvt. Exh. 3) Detective Winders testified Defendant's hand was visibly shaking when he provided the license. (Tr. at 33)

32.    Detective Williams handed Defendant's driver's license back to him at 7:20:40. (Tr. at 33-34; Gvt. Exh. 3)

6

33. Detective Williams then explained to Defendant that it was his job to contact individuals to ensure they are not carrying large amounts of narcotics, illegal firearms, or large amounts of illegal currency. (Tr. at 34) He asked Defendant if Defendant had anything like that. (Tr. at 34) Defendant responded that he had a small amount of marijuana, approximately 7 grams. (Tr. at 35, 38, 97)

34. Defendant estimated he admitted to having marijuana no more than two minutes into conversation with Detective Williams. (Tr. at 97)

35. Defendant testified that, before his admission, he did not feel like he could have walked away. (Tr. at 97) Defendant felt his movement was confined because if he had wanted to leave, the only path would have been to his left toward the officers. (Tr. at 97-98, 100) Defendant stated he was raised to comply with law enforcement. (Tr. at 102)

36. At 7:20:52, Agent Marriott exited the bus station and remained farther back from Detective Winders and Detective Lanaman, who were still four benches away from Detectives Williams and Love and Defendant. (Tr. at 67; Def. Exh. 1) Agent Marriott did not remain stationary and, at times, had his back toward Defendant. (Def. Exh. 1)

37. Detective Winders, Detective Lanaman and Agent Marriott would have all been visible to Defendant in their respective locations. (Tr. at 89) Defendant testified he believed they were law enforcement. (Tr. at 95-96)

38. Detective Williams is seen gesturing with his arms at 7:21:01. (Gvt. Exh. 3) Detective Williams testified he always follows the same procedure when encountering individuals with small amounts of marijuana, to include hand movements. (Tr. at 34) He explains marijuana laws and tries to calm the individual. (Tr. at 70-71) Based on this practice, Detective Williams believed he made the gesturing arm movements after Defendant admitted he had marijuana. (Tr. at 70-71; Gvt. Exh. 3 at 7:21:01)

39. Detective Williams asked Defendant if he could search his bags. (Tr. at 35) Detective Williams testified Defendant became increasingly nervous and that, the more they spoke, the more Defendant stammered in his responses. (Tr. at 35, 61) Defendant indicated Detective Williams could search the large duffle bag. (Tr. at 35, 36) Although Defendant initially said Detective Williams could search the backpack, he then stated he was not sure that he wanted him to do so. (Tr. at 35)

40. They discussed the current marijuana laws and Detective Williams told Defendant if he truly did only have a small amount, Defendant would be issued a ticket, provided a signature bond, and allowed to continue his travels. (Tr. at 35-36)

7

41.    A search of Defendant's duffel bag revealed a foil package of Swisher Sweets.  (Tr. at 37)  While Detective Williams was looking through the duffel bag, Defendant indicated at approximately 7:21:50 he also had a small amount of marijuana in his backpack. (Tr. at 37, 38)  Defendant started to open his backpack and stated, "I can just get it for you." (Tr. at 37)  Detective Williams testified this made him nervous about a concealed firearm.  (Tr. at 37)  Detective Williams further testified he was suspicious of Defendant offering to get the marijuana, as it was common for individuals to offer up a small amount of marijuana in hopes that being helpful would result in law enforcement leaving them alone.  (Tr. at 37-38)

42.    During this encounter, neither Detective Williams nor Detective Love displayed a weapon.  (Tr. at 38-39, 86)  They did not physically grab Defendant, handcuff him, or retain any of his property.  (Tr. at 39, 86)  Likewise, neither Detective Winters, Detective Lanaman nor Agent Marriot displayed weapons, physically grabbed Defendant, handcuffed him or retained any of his property.  (Gvt. Exh. 3; Def. Exh. 1)

43.    At approximately 7:22:16, Detective Winders moved closer and stood near the middle of the walkway.  (Tr. at 39, 69-70; Def. Exh. 1)

44.    At approximately 7:22:53, Detective Lanaman, wearing a camouflage jacket, positioned himself on the left side of the walkway.  (Tr. at 39, 69-70; Def. Exh. 1)

45.    At approximately 7:23:07, Detective Williams performed a pat down on Defendant.  (Tr. at 40; Gvt. Exh. 3)  He then asked Defendant to follow him to an interview room.  (Tr. at 40)

46.    Detective Williams and Defendant began walking inside at approximately 7:23:35.  (Gvt. Exh. 3; Def. Exh. 1)  Detectives Love, Winders and Lanaman followed behind.  (Gvt. Exh. 3; Def. Exh. 1)

47.    The walk from the smoking area to the interview room took less than one minute.  (Tr. at 40, 71)

48.    Shortly after sitting down in the interview room, Defendant provided consent for Detective Williams to search his backpack. (Tr. at 40, 72) Detective Williams found two packages of marijuana and a package of cocaine wrapped in plastic. (Tr. at 40-41; Gvt. Exh. 5; Gvt. Exh. 17)

49.    Defendant was placed under arrest and given a *Miranda* warning.  (Tr. at 42, 72)  Defendant waived his rights and agreed to speak with Detective Williams.  (Tr. at 73)

8

### III.  DISCUSSION

Defendant challenges his May 26, 2020 seizure.  He argues that law enforcement lacked reasonable suspicion of criminal activity.  As a result, Defendant seeks suppression of the evidence seized from his luggage on grounds that his subsequent consent to search was fruit of the alleged unreasonable seizure.  The Government maintains that the events began as a lawful consensual encounter and that the ultimate seizure was supported by reasonable suspicion.

The Fourth Amendment prohibits unreasonable searches and seizures.  However, not all encounters with law enforcement fall within the ambit of the Fourth Amendment.  The Supreme Court has identified three categories of police-citizen encounters.  *See Florida v. Royer*, 460 U.S. 491 (1983).  "The first, and least intrusive, police contact occurs when law enforcement officers merely approach an individual . . . and ask if he is willing to answer some questions.  Because this encounter in a public place is consensual it does not constitute a seizure within the meaning of the [F]ourth [A]mendment."  *United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1988).  The second is a brief, minimally-intrusive seizure or investigative stop which must be supported by a reasonable suspicion of criminal activity.  *See Royer*, 460 U.S. at 498-99; *Hernandez*, 854 F.2d at 297.  The third is an arrest supported by probable cause.  *See Royer*, 460 U.S. at 499; *Hernandez*, 854 F.2d at 297.  Determining within which category police-citizen encounters fall "is fact intensive and turns on the unique facts of each case."  *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008).

#### Consensual Encounter

Law enforcement do not violate the Fourth Amendment by merely approaching an individual in a public place and asking him or her questions.  *Florida v. Bostick*, 501 U.S. 429, 434

(1991). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage – provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 201 (2002); *see also United States v. Rodriguez*, No. 17-00112-01-CR-W-BP, 2019 WL 5078456 at *7 (W.D. Mo. Aug. 2, 2019), *adopted by* 2019 WL 4673188 (W.D. Mo. Sept. 25, 2019). "An encounter which is initially consensual, however, can become non-consensual and therefore 'implicat[e] the Fourth Amendment when, considering the totality of the circumstances, the questioning is so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave' or to end the encounter." *United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012)(quoting *United States v. Villa-Gonzalez*, 623 F.3d 526, 631 (8th Cir. 2010)). Factors to analyze when considering the totality of the circumstances include "[o]fficers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation." *Id*. (quoting *Griffith*, 533 F.3d at 983). "A request to see identification is not a seizure, as long 'as the police do not convey a message that compliance with their request[ ] is required.'" *United States v. Vera*, 457 F.3d 831, 834-35 (8th Cir. 2006)(quoting *Bostick*, 501 U.S at 435)).

The reasonable person standard is an objective one,[3] taking into account how a reasonable

---

[3]Defendant agrees that analysis of whether a seizure occurred is conducted using an objective standard. (Tr. at 104) Although testimony was elicited concerning national events and the death of George Floyd the day before the encounter at issue and defense counsel asks the Court to consider the perspective "of a young black male as opposed to another individual" (Tr. at 105), the controlling objective standard does not contemplate Defendant's particular circumstances.

and innocent person would feel, not how the particular suspect felt. *Drayton*, 536 U.S. at 202. *See also Michigan v. Chesternut*, 486 U.S. 567, 574 (1988)("This 'reasonable person' standard also ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.")  The race of a suspect is thus not a factor in seizure analysis. *See United States v. Mercado-Gracia*, 989 F.3d 829, 837-38 (10th Cir. 2021); *United States v. Knights*, 989 F.3d 1281, 1288 (11th Cir. 2021); *United States v. Easley*, 911 F.3d 1074, 1081-82 (10th Cir. 2018)(citing *California v. Hodari D.*, 499 U.S. 621, 628 (1991) ("the test for existence of a 'show of authority' [for seizure purposes] is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.")).

In the present case, Defendant argues that he was seized at 7:18 by a show of authority when law enforcement followed him out of the bus station and into the public designated smoking area. (Tr. at 104-105) Defendant agrees, however, that law enforcement had reasonable suspicion for an investigative stop once he first admitted to having marijuana.  (Tr. at 106)  The evidence of record establishes Defendant first admitted to having marijuana in his backpack less than two minutes after Detective Williams approached him in the designated smoking area.  (Fact 34)  As a result, the events preceding Defendant's admission are key.

Detectives Williams and Love made contact with Defendant at approximately 7:18:20 in the outdoor smoking area.  (Fact 20)  Detective Williams stood in front of Defendant at arms' length.  (Fact 20)  Detective Love remained approximately six feet to Defendant's right and stood near the wall, between Defendant and the docking area.  (Fact 21)  The respective positions of the detectives left the entire area to Defendant's left and the walkway to the bus station door clear.

11

(Fact 21)

This encounter was in a public place; Detective Williams, wearing plain clothes, identified himself as a detective and asked if he could speak to Defendant. (Facts 20, 21, 24) Defendant replied, "Sure." (Fact 24) Detective Williams inquired where Defendant was coming from, where he was going, and where he lived. (Fact 25) Detective Williams then requested to see Defendant's bus ticket and driver's license. (Facts 29, 31) Defendant complied. (Facts 29, 31) Detective Williams returned Defendant's ticket and driver's license after he inspected them. (Fact 32) When asked about narcotics, Defendant stated he had a small amount of marijuana. (Fact 33) This admission occurred just a short time into the encounter, approximately two minutes. (Fact 34) At this point, Defendant is standing with Detectives Williams and Love; Detective Winders and Detective Lanaman, and ultimately Agent Marriott, are four benches away. (Facts 23, 28, 36) Detective Love testified Detective Williams' demeanor was calm. (Fact 26) Detective Williams described his own demeanor when discussing marijuana laws as one in which he tries to calm the individual. (Fact 38) During this encounter, neither Detective Williams nor Detective Love displayed a weapon, physically grabbed Defendant, handcuffed him, or retained any of his property. (Fact 42) There is no evidence that the officers indicated Defendant was the focus of a particular investigation.

Defendant argues, *supra*, that he was seized by a show of authority. Throughout the encounter, Detective Winders, Detective Lanaman and Agent Marriott exited the bus terminal and stood outside on the walkway at varying distances. Detective Winders exited at 7:18:24, Detective Lanaman exited at 7:19:38, and Agent Marriott at 7:20:50. (Facts 23, 28, 36) Despite being in plain clothes, Defendant believed they were law enforcement. (Fact 37) At no point did Detective

12

Winders, Detective Lanaman or Agent Marriott display weapons or make physical contact with Defendant. (Fact 42) Instead, the officers remained at a significant distance and appeared, *inter alia*, to be casually conversing with each other. Although they did stand in the general direction Defendant would have had to walk to exit the smoking area, they remained at a distance and at the very outer edge of the wide walkway on the docking area side, which would not have impeded Defendant's ability leave. *Cf. I.N.S. v. Delgado*, 466 U.S. 210, 217-18 (1984)(holding no seizure occurred when uniformed INS agents were posted at workplace exits and the workers were not told they were not required to respond); *United States v. Richards*, 611 F.3d 966 (8th Cir. 2010)(holding interaction involving four officers and defendant inside bus did not constitute seizure). Additionally, the adult and child who were also in the smoking area were positioned between the location where Defendant and Detectives Williams and Love stood and that of Detective Winters, Detective Lanaman and, eventually, Agent Marriott. The child is seen freely skipping back and forth across the unobstructed walkway. The officers did not move forward in closer proximity to Defendant until after Defendant admitted to possessing marijuana (Facts 43, 44) -- a point at which not only reasonable suspicion, but probable cause existed. *United States v. Binion*, 570 F.3d 1034, 1040 (8th Cir. 2009)(holding that a suspect's admission to carrying an ounce of marijuana in his pants created probable cause for an arrest). The Court finds that the totality of the circumstances in the two minutes preceding Defendant's admission demonstrate a reasonable person would have felt free to end the encounter, thus making it consensual. Accordingly, the Court recommends a determination that there was no unlawful seizure under the Fourth Amendment.

### Investigatory Seizure

Even if the encounter were found not to be consensual, the Court finds the investigatory

13

seizure was supported by reasonable suspicion.  As stated above, an investigative seizure supported

by reasonable suspicion is permissible under the Fourth Amendment.  *Hernandez*, 854 F.2d at 297.

When making this determination, the court "may consider any added meaning [that] certain conduct

might suggest to experienced officers trained in the arts of observation and crime detection. . . . It

is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to

an interpretation of guilt, . . . however, the officers must be acting on facts directly relating to the

suspect's conduct and not just a 'hunch' or on circumstances which describe a very broad category

of predominantly innocent travelers."  *United States v. Hawthorne*, 982 F.2d 1186, 1189 (8th Cir.

1992)(quoting *United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir. 1988)).  Indeed, the Court

must look at the totality of the circumstances to see if the detaining officer had a particularized and

objective basis for suspecting wrongdoing.  *United States v. Montgomery*, 828 F.3d 741, 743, 44

(8th Cir. 2016).

The record in this case establishes that Defendant exited a bus that had arrived from Dallas,

Texas.  (Fact 11)  Texas is a known source state for narcotics.  (Tr. at 6, 14)  Detective Williams

has made numerous arrests of suspected narcotic traffickers traveling by bus from Dallas.  (Fact 6)

As Defendant exited, he watched the activities of the K-9 and stood back away from the luggage

area[4] which, in Detective Williams' experience, was suggestive of illegal activity.  (Facts 9, 12, 13,

14)  When Defendant provided Detective Williams his ticket and driver's license, Defendant

appeared nervous and his hands were visibly shaking.  (Facts 29, 31)  Defendant swallowed hard

resulting in seeing Defendant's Adam's apple, which Detective Williams testified is another

---

[4]Even given Detective Williams' testimony that Defendant standing back from the bus caught his attention as suspicious, Detective Williams acknowledged that on May 26, 2020, the CDC recommended six feet of social distance. (Tr. at 18, 21, 49, 52-53)  While the Court considers Defendant's proximity from the bus in its analysis, inclusion of this factor is not necessary to the reasonable suspicion determination.

14

indicator of nervousness.  (Fact 29)  Detective Williams' review of Defendant's bus ticket revealed it was paid for in cash, which he testified can be indicative of illegal activity.  (Fact 30)  Defendant then admitted to possessing marijuana.  (Fact 34)  Detective Williams testified Defendant became increasingly nervous and stammered in his responses as they spoke.  (Fact 39)  After the initial admission of a small amount of marijuana, Defendant admitted at 7:21:50 to having additional marijuana in his backpack.  (Fact 41)  The totality of these circumstances support Defendant's seizure.  Thus, the Court recommends a determination that, if in the alternative, the encounter were found to be non-consensual, reasonable suspicion supported the seizure.

## IV.  CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this Report and Recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ *Jill A. Morris*
JILL A. MORRIS
UNITED STATES MAGISTRATE JUDGE

15